UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

U.S. SPECIALTY INSURANCE CO.                    CIVIL ACTION

V.                                              NO. 18-7741

STRATEGIC PLANNING ASSOCIATES,                  SECTION "F"
LLC, CHARLOTTE W. BURNELL, AND
WILLIAM J. BURNELL

ORDER AND REASONS

Before the Court are two summary judgment motions by the plaintiff: (1) motion for summary judgment on the plaintiff's affirmative claims; and (2) motion for partial summary judgment on count six of the defendants' counterclaim, pertaining to the plaintiff's purported liability for SPA's claims against Core. For the reasons that follow, the motion for summary judgment on the plaintiff's affirmative claims is GRANTED, in part, and DENIED, in part, and the plaintiff's motion for partial summary judgment on count six of the defendants' counterclaim is GRANTED.

**Background**

This indemnity action arises out of the renovation of a New Orleans charter school and the construction disputes that ensued.

In 2013, the Louisiana Department of Education Recovery School District, as owner, entered into a contract with Core Construction Services, LLC, as general contractor, for the

1

renovation of Sophie B. Wright High School.  Core, in turn, entered into a subcontract with Strategic Planning Associates, LLC, a Disadvantaged Business Enterprise, for the fabrication and erection of steel for the project.

As is customary in the construction industry, the subcontract required SPA to provide bonding to secure the performance of its work and ensure payment to its subcontractors and suppliers. Accordingly, SPA turned to United States Specialty Insurance Company.  Serving as surety, USSIC issued a performance bond and a payment bond, naming Core as obligee and SPA as principal.[1]

Months earlier, on April 8, 2014, SPA and its representatives, Charlotte Burnell and William Burnell, had executed a General Indemnity Agreement in favor of USSIC, in which they agreed to "indemnify . . . and hold [USSIC] harmless from and against any and all demands, liabilities, losses, costs, damages, attorneys' fees, and expenses" incurred by USSIC as a result of issuing bonds on behalf of SPA and to reimburse USSIC for any disbursements made by USSIC in good faith.  In addition, SPA, as principal, and the Burnells, as indemnitors, assigned to USSIC their "right, title, and interest in . . . any causes of action, claims, demands, or actions of whatsoever kind" that SPA might have against any party to a contract with SPA.  SPA and the Burnells also gave USSIC "the

---

[1] Each bond carried a penal sum of $1,187,921.

right, in its sole and absolute discretion, to adjust, settle, prosecute, defend, compromise, litigate, protest, or appeal any claim, demand, suit, award, assessment or judgment on or in connection with any Bond, Bonded Contract, or Contract," while retaining the right to challenge USSIC's settlement of claims for lack of good faith, provided that they had delivered collateral security to cover USSIC's perceived exposure. Finally, the indemnitors irrevocably designated USSIC "as their attorney-in-fact with the right, but not the obligation, to exercise all of the rights . . . assigned, transferred and set over to [USSIC] in [the Indemnity] Agreement."

As the project fell behind schedule, disputes arose between SPA and Core. First, during the spring of 2015, Core issued a notice to cure, informing SPA that steel shop drawings were incomplete and that SPA's untimeliness had negatively impacted the project's schedule. SPA responded that it was unable to begin working because other vendors had not yet performed necessary demolition work; Core agreed to modify the schedule. Later that summer, Core issued two additional notices to cure, again advising SPA that it was behind schedule. Attributing the delay to Core's mismanagement of the project schedule, SPA promptly informed USSIC of its position. Nonetheless, upon Core's request, USSIC retained consultant Mark Stein of the Guardian Group, Inc. to supervise SPA's scope of work on the project. And despite representing to

SPA that he would act in SPA's best interest, the USSIC representative began communicating directly with Core regarding SPA's obligations under the subcontract. According to the affidavit of Charlotte Burnell, Stein also encouraged her to request financial assistance from USSIC to pay outstanding invoices from SPA's subcontractors and suppliers until USSIC or SPA could collect from Core. USSIC then decided to pay various invoices from Triple G Steel & Supply, Inc., All Crane Rental of Louisiana, LLC, and other suppliers and subcontractors, even though the entities had not filed claims against USSIC under the payment bond.

On December 22, 2015, Core issued a notice of termination to SPA and made demand upon USSIC under the performance bond that same day. Jason Bruzik, who worked for Core at that time, has testified that USSIC threw SPA under the bus and encouraged Core to terminate the subcontract. Disputing the propriety of its termination, SPA urged USSIC to deny Core's claim under the performance bond. Through two extensive letters, counsel for SPA explained to USSIC's attorney that Core had breached its obligations to SPA under the subcontract in various ways, relieving USSIC of any obligations to Core under the performance bond.

By letter dated February 19, 2016, USSIC made demand on SPA and the Burnells for the deposit of $1,000,000 in collateral security to cover amounts paid to SPA's subcontractors and

suppliers in connection with the payment bond, as well as USSIC's potential exposure with respect to Core's claim under the performance bond. Counsel for SPA and the Burnells responded to USSIC's demand on March 4, 2016, advising that his clients would not deliver collateral security at that time:

> At this point in time the Indemnitors are not delivering the collateral security . . . . Instead, the Indemnitors request that they be given an extension of time so that SPA can illustrate why the collateral demand . . . is premature and not warranted, and why the amount of $ 1 million is excessive.[2]

In the meantime, on February 24, 2016, USSIC denied Core's claim under the performance bond based on its findings that Core had breached various provisions of its subcontract with SPA. Five months later, on July 29, 2016, Core sued USSIC under the performance bond, alleging damages in the principal sum of $1,443,581.79 and additional damages for bad faith; Core also filed an arbitration demand against SPA, seeking more than $1,000,000 in damages, and SPA filed a counterclaim against Core also seeking to recover in excess of $1,000,000.[3]  Despite previously taking the

---

[2] Although the indemnitors maintained their position that additional security was premature and unwarranted, by letter dated April 12, 2016, they offered to assign to USSIC their secured rights under the Louisiana Public Works Act up to an amount agreeable to USSIC, SPA, and the indemnitors.

[3] In the performance bond suit against USSIC, Core alleged that SPA breached the subcontract by failing to: pay suppliers and subcontractors, perform in accordance with Core schedules, submit an updated recovery schedule, furnish materials in a timely manner, deliver structural and decorative steel, and submit required documentation.

position that it was not liable to Core because Core had breached the subcontract with SPA, USSIC reversed course and decided to settle.

Pursuant to a settlement agreement dated May 12, 2017, USSIC paid Core $450,000, settled the claims asserted by Core against USSIC and SPA, and waived SPA's rights against Core. SPA was not aware of the settlement until after the agreement was confected. Thereafter, the performance bond suit between Core and USSIC, as well as the arbitration between Core and SPA, were dismissed. In dismissing Core's claims against SPA, the arbitrator held that USSIC had the right and authority under the General Indemnity Agreement to settle all causes of action between the parties.[4] Meanwhile, USSIC also made payments to the following subcontractors and suppliers of SPA:

| Triple G Steel & Supply, Inc. | $ 325,396.01 |
| All Crane Rental of Louisiana, LLC | $ 158,092.50 |
| JE Consulting and Construction, LLC | $ 145,000.00 |
| New Orleans Iron Works LLC | $ 11,380.00 |
| United Rentals (North America), LLC | $ 72,569.98 |
| Gulf Coast Industrial Service | $ 8,000.00 |

---

[4] SPA appealed the arbitrator's ruling, which was upheld by the Orleans Parish Civil District Court, as well as the Louisiana Fourth Circuit Court of Appeals.

On August 15, 2018, USSIC filed this lawsuit against SPA, Charlotte Burnell, and William Burnell pursuant to the General Indemnity Agreement. In its complaint, USSIC seeks $1,339,756.09 in damages plus all additional losses, attorneys' fees, costs, and expenses incurred as a result of having executed the bonds; interest from the date payments were made by USSIC; and all costs of these proceedings. In response, SPA and the Burnells filed a counterclaim against USSIC, asserting the following causes of action: (1) bad faith breach of the General Indemnity Agreement; (2) bad faith breach of the performance bond; (3) bad faith breach of the payment bond; (4) bad faith breach of fiduciary duty; (5) detrimental reliance; and (6) liability for SPA's claims against Core.[5] In December of 2018, USSIC moved for partial dismissal of

---

[5] With respect to damages, the defendants allege a loss of business assets, goodwill, bonding capacity, future business earnings, and the opportunity to seek redress against Core for Core's numerous contractual breaches.

Specifically, they allege that Core breached the subcontract by: (1) failing to honor its heightened obligations to SPA (as a Disadvantaged Business Enterprise); (2) failing to properly manage the project; (3) unilaterally changing the agreed upon schedule of values; (4) requiring SPA to coordinate drawing with other divisions and requiring SPA to retain a professional engineer; (5) refusing to pay SPA on the first pay-application; (6) improperly issuing a default and cure notice on March 17, 2015; (7) issuing an improper default notice in August of 2015; (8) failing to pay SPA for delays to the project; (9) failing to pay SPA for extra work that Core demanded SPA perform; (10) continually failing to pay SPA throughout the project's duration; (11) usurping SPA's role and commandeering SPA's subcontractors; (12) refusing to allow SPA's project managers to perform their work; (13)

the defendants' counterclaim under Rule 12(b)(6), contending that no cause of action exists against USSIC under Louisiana law for bad faith breach of the General Indemnity Agreement, the performance bond, the payment bond, or fiduciary duty. In its Order and Reasons dated January 23, 2019, this Court granted USSIC's motion and dismissed the aforementioned claims with prejudice.

USSIC now moves for summary judgment on its affirmative claims and for partial summary judgment on count six of the defendants' counterclaim, which concerns USSIC's purported liability for SPA's claims against Core.

I.

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law. No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A genuine dispute of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

---

misrepresenting the payment situation to SPA's subcontractors and suppliers; and (14) improperly terminating SPA in bad faith.

The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. See id. In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992). Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims. Id. Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987); Fed. R. Civ. P. 56(c)(2). "[T]he nonmoving party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007) (internal quotation marks and citation omitted). Ultimately, "[i]f the evidence is merely colorable . . . or is not significantly probative," summary judgment is appropriate. Anderson, 477 U.S. at 249 (citations omitted); King v. Dogan, 31 F.3d 344, 346 (5th Cir. 1994) ("Unauthenticated documents are improper as summary judgment evidence.").

Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In deciding whether a fact issue exists, courts must view the facts and draw

reasonable inferences in the light most favorable to the non-moving party. <u>Scott v. Harris</u>, 550 U.S. 372, 378 (2007). Although the Court must "resolve factual controversies in favor of the nonmoving party," it must do so "only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." <u>Antoine v. First Student, Inc.</u>, 713 F.3d 824, 830 (5th Cir. 2013) (internal quotation marks and citation omitted).

## II.

USSIC moves for: (1) summary judgment on its affirmative claims for the sum of $1,355,227.29, plus all additional losses, costs, expenses, consulting fees, and attorneys' fees incurred as a result of having issued the bonds; and (2) partial summary judgment on count six of the defendants' counterclaim, which pertains to USSIC's purported liability for SPA's claims against Core.

In support of both motions, USSIC submits that the General Indemnity Agreement governs the relationship between the parties and that the defendants' only possible defense to their indemnity obligation and vehicle for challenging USSIC's waiver of SPA's own claims against Core is USSIC's lack of good faith. Because the defendants failed to satisfy the condition precedent required to challenge USSIC's good faith with respect to the settlement of claims, USSIC submits, the defendants can neither evade their

indemnity obligation, nor recover from USSIC respecting its decision to settle SPA's claims against Core.

The defendants counter that summary judgment is premature because discovery is in its early stages, and in any event, genuine issues of material fact exist as to whether USSIC acted in good faith in settling with Core under the performance bond and in paying SPA's suppliers and subcontractors who had not properly made claims under the payment bond.

*A.*

A "contract of indemnity forms the law between the parties and must be interpreted according to its own terms and conditions." Abbott v. Equity Group, Inc.*, 2 F.3d 613, 626 (5th Cir. 1993) (quoting Commercial Union Ins. Co. v. Melikyan, 430 So. 2d 1217, 1221 (La. App. 1 Cir. 1983)). Indeed, its "terms, provisions and conditions should and will be enforced as written unless they run counter to law or violate well-defined public policy or good morals." Fidelity & Deposit Co. v. Thieme, 193 So. 496, 497 (La. App. 2 Cir. 1940). Moreover, Louisiana jurisprudence has consistently recognized a distinction between a contract of indemnity and a contract of suretyship: "In an indemnity contract, the principal and indemnitors can be bound to the surety in any manner they elect in consideration of the surety issuing the bond covering the principal obligation." Id.; see also Liem v. Austin Power, Inc., 569 So. 2d 601, 608 (La. App. 2 Cir. 1990)

(emphasizing that an indemnity agreement is designed "to allocate the risk inherent in the activity between the parties to the contract.").

*B.*

In this case, SPA, as principal, and the Burnells, as indemnitors, executed the General Indemnity Agreement in favor of USSIC, as surety. As such, the indemnity agreement forms the law between the parties. See <u>Abbott</u>, 2 F.3d at 626. Pursuant to that contract, SPA and the Burnells agreed, among other things, to:

> (1) "indemnify . . . and hold [USSIC] harmless from and against any and all demands, liabilities, losses, costs, damages, attorneys' fees, and expenses . . . which [USSIC] may sustain or incur or which arise by reason of or in any manner in consequence of . . . the execution or procurement of [USSIC] of any Bond."
>
> (2) reimburse USSIC for "any and all disbursements made by it in Good Faith under the belief that:"
>
>> (1) "any Principal or Indemnitor is or has been in default pursuant to this Agreement;"
>> (2) "[USSIC] was or might be liable to pay the claims asserted or sums paid, whether or not such liability actually existed;" or
>> (3) "such payments were necessary or expedient, in [USSIC's] sole and absolute discretion, to protect any of [its] rights or interests or to avoid or lessen [its] liability or alleged liability whether or not such liability, necessity or expediency actually existed."
>
> (3) assign to USSIC their "right, title, and interest . . . in and to any causes of action, claims, demands, or actions of whatsoever kind or nature which [SPA] may have or acquire against any party to any Contract . . . including but not limited to, actions against any owner, obligee, . . . or any other person or entity performing or providing labor, materials or services in connection

with any work called for in connection with any
Contract."

(4) irrevocably designate USSIC "as their attorney-in-
fact with the right, but not the obligation, to exercise
all of the rights . . . assigned, transferred and set
over to [USSIC] in this Agreement;"

(5) grant USSIC "the right, in its sole and absolute
discretion, to adjust, settle, prosecute, defend,
compromise, litigate, protest, or appeal any claim,
demand, suit, award, assessment or judgment on or in
connection with any Bond, Bonded Contract, or Contract,"
while retaining the right to challenge USSIC's "Good
Faith with respect to settlement of any claims asserted
against [USSIC]," provided  they had:
    (a) given written notice that they desired USSIC to
    consider settling claims, and
    (b) deposited with USSIC "collateral, in form and
    amount acceptable to [USSIC] in its sole and
    absolute discretion, to completely cover [USSIC's]
    exposure or perceived exposure to any loss, cost or
    expense for which [USSIC] is entitled to
    exoneration, identification or reimbursement;" and

(6) in the event of default or the making of a claim
under either bond, immediately deposit at USSIC's demand
collateral "in any amount, value, form, and source as
may be designated by and acceptable to [USSIC] in its
sole and absolute discretion."

III.

The Court first considers USSIC's motion for summary judgment

regarding its affirmative claims.  USSIC contends that SPA and the

Burnells are liable *in solido* to reimburse USSIC for the sums paid

for the settlement under the performance bond, payment of claims

to subcontractors and suppliers, as well as consulting fees,

attorneys' fees, and other expenses.  For support, USSIC submits

the sworn affidavit of Paul Guelpa, USSIC's Vice President of Bond

Claims, as well as vouchers that document the date each invoice was received and paid. Mr. Guelpa attests that, after investigating (and initially denying) Core's claim, USSIC settled with Core for $450,000. He further attests that USSIC made a total of $720,438.49 in payments to various subcontractors and suppliers of SPA, paid $45,235.95 in consulting fees to the Guardian Group, and has incurred $172,620.15 in attorneys' fees from Dunlap Fiore, LLC, the law firm retained to assist in defending the claims asserted under the performance and payment bonds, as well as $52,050.40 in attorneys' fees from Simon, Peragine, Smith, & Redfearn, LLP, the firm that has represented USSIC in enforcing the indemnity agreement against SPA and the Burnells. Finally, Guelpa states that USSIC has incurred additional costs and fees with respect to the claims asserted against the bonds totaling $9,175.93. Because USSIC has been reimbursed $94,293.63, Guelpa submits that it has suffered a net loss of $1,335,227.29.

SPA and the Burnells counter that there are questions of fact as to whether the payments made by USSIC were "bond claims" and whether USSIC acted in bad faith in making such payments. They submit that the $450,000 settlement payment to Core was made to resolve claims against USSIC outside the scope of SPA's work on the project and that USSIC made payments to subcontractors and suppliers, even though formal claims had not been made under the payment bond. The defendants further contend that USSIC's abrupt

14

decision to settle Core's claim under the performance bond can only be explained by a motivation to resolve Core's bad faith claims against USSIC for encouraging Core to terminate SPA. The defendants also submit that Mark Stein and Paul Guelpa, representatives of USSIC, fraudulently induced Charlotte Burnell to request financial assistance from USSIC in paying SPA's suppliers and subcontractors.

*A.*

Pursuant to the plain terms of the indemnity agreement, SPA and the Burnells agreed to:

> indemnify . . . and hold [USSIC] harmless from and against any and all demands, liabilities, losses, costs, damages, attorneys' fees, and expenses . . . which [USSIC] may sustain or incur or which arise by reason of or in any manner in consequence of . . . the execution or procurement of [USSIC] of any Bond.

In interpreting a similar indemnity provision, which required indemnification for expenses incurred "because of having furnished" bonds, the U.S. District Court for the Middle District of Louisiana explained that "the question under th[e] provision is essentially one of casualty." Gray Ins. Co. v. Terry, No. 2:07-CV-1523, 2014 U.S. Dist. LEXIS 29925, at *19 (W.D. La. Mar. 5, 2014). In other words, the Western District explained, "[a]n indemnification obligation will exist if the expense incurred by [the surety] would not exist but for [the surety's] having issued payment and performance bonds to the [indemnitors.]." Id.

15

Here, Core asserted a claim against USSIC under the performance bond, which USSIC investigated, initially denied, and then settled for the sum of $450,000. The record also reflects that USSIC paid various subcontractors and suppliers of SPA either after those entities had asserted claims under the payment bond or at the direction of SPA. Along the way, USSIC incurred attorneys' fees, costs, and other expenses. Accordingly, the Court finds that the losses, costs, fees, and expenses incurred by USSIC in this matter – to date totaling $1,355,227.29 – would not exist but for USSIC having issued the performance and payment bonds.

The Court also finds that USSIC has properly proven its losses. With respect to reimbursement, the General Indemnity Agreement provides, in part:

> In the event of any payment by the Surety, an itemized statement of the amount of any such payment sworn to by any officer or authorized representative of the Surety, or any voucher or vouchers, invoices or other evidence of such payment shall be *prima facie* evidence of the fact and the amount of such payment, and the extent of the liability of any Principal and Indemnitor to the Surety . . . .

As evidence of the losses, costs, and expenses incurred by USSIC as a result of having issued the bonds, USSIC submits the sworn affidavit of Paul Guelpa, USSIC's Vice President of Bond Claims, along with vouchers that document that the date each invoice was received and paid. This affidavit, coupled with proof of payments, constitutes prima facie evidence of both the accuracy of the

amounts sought and the indemnitors' liability for such payments. See Commercial Union Ins. Co. v. Melikyan, 430 So. 2d 1217, 1221 (La. App. 1 Cir. 1983) ("Proof of payments made by [the surety] constitute[s] prima facie evidence of [the indemnitors'] liabilities.").

*B.*

The Court next considers whether the defendants can overcome USSIC's prima facie case by presenting evidence that the payments were made in bad faith. Although USSIC maintains that it acted in good faith in incurring each loss and expense, it submits that the indemnitors are precluded from challenging its good faith with respect to each payment made and expense incurred because they failed to deliver collateral security. With respect to the settlement of claims, the General Indemnity Agreement provides, in part:

> If . . . any Principal or Indemnitor desires that the Surety consider adjusting, settling, prosecuting, defending, compromising, litigating, protesting, or appealing any claim, demand, suit, award, assessment, or judgment against any Principal or the Surety, such Principal or Indemnitor shall:
>
> A. Give written notice to the Surety to this effect by certified or registered mail; and
> B. Simultaneously therewith, deposit with the Surety cash, securities or other collateral, in form and amount acceptable to the Surety in its sole and absolute discretion, to completely cover the Surety's exposure or perceived exposure to any loss, cost or expense for which the Surety is entitled to exoneration,

> indemnification or reimbursement pursuant to this Agreement . . . .

> **The Principal and/or Indemnitor's performance of both Subsection A and B of this Section IX shall be an absolute condition precedent to the right of the Principal and/or Indemnitor to challenge the Surety's Good Faith with respect to settlement of any claims asserted against the Surety.** The Principal and/or Indemnitor's performance of both sub-sections A and B of this Section IX shall not, however, in any way diminish the right of the Surety to compromise, settle, pay, or otherwise discharge any claim, demand, suit, award or judgment in its sole and absolute discretion, subject only to its obligation of Good Faith as provided herein.

(Emphasis added).

It is undisputed that USSIC issued a collateral demand to SPA and the Burnells to cover its perceived exposure to potential losses, costs, expenses, and attorneys' fees associated with claims made under the performance and payment bonds and that the indemnitors refused to provide collateral. Pursuant to the plain terms of the agreement, the indemnitors' delivery of collateral is an "absolute condition precedent" to their right **"to challenge [USSIC's] Good Faith with respect to settlement of any claims asserted against [USSIC]."** (emphasis added). Accordingly, the defendants' failure to deliver collateral security bars them from challenging USSIC's good faith with respect to the settlement of Core's claims against USSIC under the performance bond, as well as the settlement of all claims asserted against USSIC by SPA's subcontractors or suppliers. However, it does not preclude the defendants from challenging USSIC's good faith with respect to

*other* losses sustained or expenses incurred where a claim had not been asserted against USSIC.

Although it is undisputed that USSIC paid SPA's subcontractors and suppliers a total of $720,438.59, the record is unclear as to which of these payments were made to satisfy claims asserted against USSIC. Notably, Paul Guelpa, USSIC's Vice President of Bond Claims, attests in his affidavit that USSIC paid a total of $720,438.49 to SPA's subcontractors and suppliers "[i]n order to facilitate work on the Project **and/or** as a result of payment claims asserted against USSIC and the Payment Bond." (emphasis added).  To the extent USSIC paid SPA's subcontractors and suppliers before a respective claim was asserted against USSIC, the defendants are not precluded from challenging USSIC's good faith in making such payments.  Moreover, genuine issues of fact exist as to whether USSIC acted in good faith in paying SPA's subcontractors and suppliers.  In this regard, Charlotte Burnell attests in her affidavit that she

> believe[s] Mark Stein and Paul Guelpa, representatives
> of USSIC, fraudulently induced SPA to request that USSIC
> pay certain entities even though these entities would
> not be considered Claimants under the Payment Bond
> and/or had not followed the express requirements/
> conditions precedent necessary to make a claim under the
> Payment Bond as they assured [her] that they would seek
> this money from Core.

These circumstances raise a serious question of fact as to whether USSIC's representatives paid certain subcontractors and suppliers

in bad faith with the intention of recovering the payments (with interest) from SPA and the Burnells.

Similarly, the consulting fees incurred by USSIC do not pertain to the settlement of claims and also involve allegations of bad faith. Although it is undisputed that USSIC incurred $45,235.95 in fees from the Guardian Group, the parties submit conflicting evidence as to whether USSIC retained this consulting firm to manage the performance of SPA's scope of work or to investigate Core's claims against the performance and payment bonds. Because the record supports an inference that Mark Stein of the Guardian Group commandeered SPA's subcontractors and took over the management of the performance of SPA's work, and that USSIC encouraged Core to terminate the subcontract of SPA, genuine issues of fact exist as to whether USSIC's consulting fees were incurred in good faith.

Accordingly, on this record, USSIC is entitled to summary judgment on its affirmative claims only with respect to the $450,000 settlement payment made to Core. Although the defendants urge the Court that summary judgment is premature, the Court finds that deferral under Federal Rule of Civil Procedure 56(d) is not warranted with respect to the aforementioned payment because the

defendants have failed to show how additional discovery might

create a genuine dispute as to any material fact in this regard.[6]

_____

[6] Federal Rule of Civil Procedure 56(d) permits a district court to defer considering a pending motion for summary judgment "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition."  Rule 56(d) motions "are broadly favored and should be liberally granted" because they "safeguard non-moving parties from summary judgment motions that they cannot adequately oppose." Culwell v. City of Fort Worth, 468 F.3d 868, 872 (5th Cir. 2006). Nonetheless, the party seeking a continuance "may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts." Raby v. Livingston, 600 F.3d 552, 561 (5th Cir. 2010) (quoting Sec. & Exch. Comm'n v. Spence & Green Chem. Co., 612 F.2d 896, 901 (5th Cir. 1980)).  Rather, the party must indicate (1) "why he needs additional discovery," and (2) "how the additional discovery will create a genuine issue of material fact." Krim v. BancTexas Grp., Inc., 989 F.2d 1435, 1442 (5th Cir. 1993).

In support of their Rule 56(d) request for a continuance, the defendants submit the affidavit of their counsel of record, Salvador Bivalacqua, in which he attests:

. . .

2. All of the parties have just begun the discovery process with outstanding discovery request [sic] by all parties pending and not yet due.

3. Counsel for USSIC understandable [sic] has refused to schedule depositions until such time as written discovery responses may be made by all.

4. The instant matter relates to a variety of actions filed before it and involves tens of thousands of pages of documents and a witness list of more than a couple of dozen.

5. It is impossible to fully prepare a defense to USSIC's claims without a modicum of discovery.

This affidavit fails to demonstrate how additional discovery might create a genuine dispute as to any material fact with respect to USSIC's settlement of the performance bond claim.  The record establishes with clarity that the General Indemnity Agreement governs the relationship between the parties.  The record also

USSIC next moves for partial summary judgment in its favor, seeking to dismiss count six of the defendants' counterclaim, in which they assert that USSIC is liable for SPA's claims against Core. USSIC submits that there is no factual or legal basis upon which the defendants can recover the damages they suffered as a result of USSIC's settlement of SPA's claims against Core. The defendants counter that they can recover these damages from USSIC because USSIC had no good faith basis for settling SPA's claims against Core. In so arguing, the defendants do not address USSIC's contention that their failure to provide collateral security precludes them from challenging USSIC's good faith with respect to the settlement of claims.

As previously discussed, the General Indemnity Agreement forms the law between USSIC (as surety), SPA (as principal), and the Burnells (as indemnitors). See Abbott, 2 F.3d at 626. Pursuant to this contract, SPA and the Burnells granted to USSIC "the right, in its sole and absolute discretion, to adjust, settle, prosecute, defend, compromise, litigate, protest, or appeal any claim, demand, suit, award, assessment or judgment on or in

---

indicates that USSIC made payments under the performance bond and that the defendants failed to provide collateral security at USSIC's request, thereby foreclosing their right to challenge USSIC's good faith with respect to the settlement of such claims. With nothing more asserted than vague conjecture that discovery will perhaps reveal helpful facts, deferral is not warranted.

connection with any Bond, Bonded Contract, or Contract." They also assigned to USSIC their "right, title, and interest . . . in and to any causes of action, claims, demands, or actions of whatsoever kind or nature which [SPA] may have or acquire against [Core]" and granted USSIC a power of attorney "to exercise all of the rights . . . assigned, transferred and set over to [USSIC] in this Agreement." As a result, USSIC had the right and authority under the General Indemnity Agreement to settle SPA's claim against Core, in its sole discretion, subject *only* to its good faith obligation.[7]

In other words, the defendants' only potential vehicle to recover their alleged damages as a result of USSIC's settlement of SPA's claims against Core would have been to establish that USSIC settled those claims in bad faith. However, because the defendants refused to provide collateral security, upon USSIC's request, to cover USSIC's perceived exposure with respect to Core's performance bond claim, they are barred from challenging USSIC's

---

[7] In American Contractors Indemnity Co. v. DiGiovanni Insultation & Refractory, Inc., No. 07-2948, 2008 U.S. Dist. LEXIS 65163 (E.D. La. Aug. 25, 2008), another Section of this Court granted a motion for summary judgment seeking enforcement of a surety bond indemnity agreement similar to the one at issue in this case. The DiGiovanni Court rejected the indemnitors' contentions that (1) the provision which gave the surety the right to settle in its sole and absolute discretion was contrary to the Louisiana Civil Code, and (2) that the surety settled the claims at its own risk because it was on notice that the indemnitors had specific defenses to the claims and that they objected to the settlement. Id.

good faith with respect to the settlement of such claim. To the extent the defendants contend that it was "not necessary" for them to post additional collateral security, the Court notes that "[t]he plain and unambiguous language of the Indemnity Agreement requires Defendants to post the collateral security demanded by [the surety] regardless of any alleged lack of good faith on the part of [the surety]." See Int'l Fid. Ins. Co. v. Vimas Painting Co., No. 2:07-cv-298, 2009 U.S. Dist. LEXIS 14962, at *17 (S.D. Ohio Feb. 26, 2009). Although the indemnitors may not like this result, they are nonetheless bound by the terms of the agreement that they voluntarily executed.

Accordingly, for the foregoing reasons, IT IS ORDERED: that the plaintiff's motion for summary judgment on its affirmative claims [Rec. Doc. 35] is GRANTED, in part, as to the $450,000 settlement payment to Core, and DENIED, in part, as to the remaining payments, expenses, and fees. IT IS FURTHER ORDERED: that the plaintiff's motion for partial summary judgment seeking dismissal of count six of the defendants' counterclaim [Rec. Doc. 36] is hereby GRANTED.[8]

---

[8] The defendants' counterclaim for detrimental reliance, which was not the subject of a summary judgment motion, remains before the Court.

New Orleans, Louisiana, May 22, 2019

_____

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE